UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JONATHAN DAVID WILKE,<br><br>         Plaintiff,<br>v.<br><br>CHARLES E. COLE, WELCOME T. ROSE,<br>CHARLES FACKTOR, JAMES GREER,<br>BRIAN FOSTER, ROBERT HUMPHREYS,<br>DYLAN RADTKE, CAPTAIN BUTEYN,<br>TOBY WATSON, RANDY SMITH,<br>MICHELLE WILINSKI,<br>KELLY A. SALINAS,<br>WILLIAM MCCREEDY, NURSE HAU,<br>MICHAEL BELONGIA,<br>SUSAN EWERDT-JOSEPH,<br>GARY H. HAMBLIN, and<br>WISCONSIN DEPARTMENT OF<br>CORRECTIONS,<br><br>         Defendants. | Case No. 12-CV-1231-JPS<br><br><br><br><br>ORDER |

  On December 4, 2012, plaintiff Jonathan David Wilke ("Wilke") commenced this civil action by filing a prisoner complaint. (Docket #1). Subsequently, the Court granted Wilke's motion for leave to file an amended complaint. (Docket #23). On September 18, 2013, Wilke filed an amended complaint, which is the operative complaint in this action. (Docket #24).

  On September 8, 2014, the Court issued an Order denying the parties' Cross-Motions for Summary Judgment. (Docket #79). On September 11, 2014, the Court issued a Trial Scheduling Order with a jury trial set for January 5, 2015. (Docket #80). On October 22, 2014, the defendants filed a Motion for Summary Judgment on Mootness and Eleventh Amendment Immunity

Grounds. (Docket #86). The matter is now fully briefed and ready for disposition.

Defendants' Motion for Summary Judgment argues that all claims against them must be dismissed for two reasons: 1) that the plaintiff's claim for injunctive relief is moot as a result of his release from prison; and 2) that the plaintiff's claim for compensatory damages is barred by the Eleventh Amendment. (Defs' Mot. Summ. J. at 1, Docket #86-3). The plaintiff concurs with defendants that his claim for injunctive relief is moot. (Pl's Opp.to Defs' Mot. Summ. J. ("Pl's Opp.") at 1, Docket #94). However, the plaintiff argues that: 1) defendants waived their Eleventh Amendment Immunity; and 2) even if the Court finds no waiver, his claim for compensatory damages is not barred by sovereign immunity. (Pl's Opp. at 1). As discussed in detail below, the Court will grant the Defendants' Motion for Summary Judgment and dismiss all claims against the defendants.[1]

1. SUMMARY JUDGMENT LEGAL STANDARD

The general standard for assessing motions for summary judgment applies, namely: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Id.* at 248. A dispute over a "material fact" is "genuine" if "the

---

[1] Title II claims are claims against the State, and therefore the defendants in this case are all sued in their official capacities only. *See Bruggeman ex rel. Bruggeman v. Blogojevich*, 324 F.3d 906, 912-913 (7th Cir. 2003). Thus, although the defendants are individually named in this case, the Court's analysis will treat the defendants as a state entity.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

2. FACTUAL BACKGROUND[2]

The facts of the case are relatively simple. Wilke was confined at Kettle Moraine Correctional Institution ("KMCI") at all times relevant to this action.[3] In his lawsuit, Wilke alleges that defendants violated the Americans with Disabilities Act ("ADA") when they failed to reasonably accommodate his disability, paruresis or "shy bladder," when requiring him to give a urine sample and when he was placed in the institution's segregation unit.

Paruresis is a type of phobia, classified as a "Social Anxiety Disorder" or "Social Phobia" in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V and DSM-IV). Typically, the cause is viewed as psychological or mental. It simply means that the sufferer is unable or finds it physically and psychologically difficult or even painful to urinate in the real or imaginary presence of others, and, in turn, experiences anxiety.

The practice at KMCI is that nurses and psychologists do not make the final diagnosis of paruresis. If an inmate complains of paruresis, a medical examination and possibly testing is required to rule out an underlying medical issue. When an inmate claims he has paruresis, staff from the Health Service Unit ("HSU") will meet with him to conduct an initial assessment. Staff from the Psychological Service Unit ("PSU") will make an initial

---

[2] The particular facts of this case are not at issue in the present Motion for Summary Judgment. However, the Court will reiterate the facts as presented in its previous Order denying summary judgment (Docket #79) to give some context to the arguments presented below.

[3] Wilke has since been transferred to federal custody, and is currently confined at the Federal Correctional Institution in Oxford, Wisconsin. (Docket #78).

diagnosis of "Social Phobia-Specific Paruresis (by self report)." This initial self-reported diagnosis alerts other PSU staff that the inmate has made the initial claim of the disorder and follow-up may be needed as they seek PSU services. Treatment services are offered, but it is the responsibility of the inmate to request and engage in treatment. PSU staff is available to meet individually with the inmate to clarify the nature of his phobia and may engage in systematic desensitization interventions or practice skill-based techniques.

The Wisconsin Department of Corrections ("DOC") performs drug testing of inmates to protect the public and provide a drug free and safe environment for staff and inmates. There is zero tolerance for drug use in DOC facilities. There is no specific accommodation policy for inmates with paruresis housed in a segregation unit, but there are general drug testing accommodation rules that may apply. When an inmate claims that he has paruresis, security contacts PSU and grants the inmate an automatic accommodation for drug testing. This allows the inmate to urinate in a "dry cell," a cell without water or other inmates. Additionally, if an inmate: was actively engaged in treatment; had no, very few, or explainable conflicting reports of symptoms and history of the disorder (from self-report and based upon collateral reports); had engaged HSU; and is not reporting improvement, then PSU may make recommendations to security after consultation with the treatment team that a single cell placement be offered to accommodate the inmate's psychological need. In such a case, treatment would continue to be implemented and the special accommodation would be reviewed periodically and on an as-needed basis in consultation with the providing therapist or medical practitioner.

When Wilke is double-celled with another inmate in segregation, it is very difficult for him to urinate and he has to force himself to do so, causing pain in his bladder. Wilke describes the pain as being "very similar to constipating." Beginning in March of 2011, Wilke submitted a Health Services Request ("HSR") complaining of "shy bladder" when asked to urinate in front of others. An HSU nurse met with Wilke and provided suggestions for overcoming the issue. In May of 2011, Wilke requested an accommodation for drug testing, citing paruresis. Wilke's request was denied. Over the course of years, Wilke requested psychological services for his paruresis, and also requested accommodations for the drug testing procedure and for a single cell while he was housed in the segregation unit. In those years, Wilke had several contacts with staff from the HSU and PSU. Wilke's requests for accommodations were, for the most part, denied. Beginning in June 2011 and continuing to October 2012, Wilke engaged KMCI's grievance process nine times, seeking a single cell in segregation or seeking accommodation in UA testing. After Wilke's complaints were denied or dismissed, Wilke filed this lawsuit.

3.  INJUNCTIVE RELIEF CLAIM[4]

The Court finds that the plaintiff's claim for injunctive relief in this action is moot, and therefore must be dismissed. The claims in this action arose from incidents that occurred at KMCI, a state institution. On May 29, 2014, the plaintiff notified the Court that he was released from state prison and is now in the custody of the federal government. (Docket #78). A prisoner's request for injunctive relief related to his confinement is rendered

---

[4] Although the parties agree on this issue, the Court will briefly address the matter in the interest of clarity.

moot by his release from prison. *Koger v. Byran*, 523 F.3d 789, 804 (7th Cir. 2008). Thus, the plaintiff's claim here for injunctive release is now moot as a result of his transfer to federal custody. Accordingly, the Court will dismiss the plaintiff's claim for injunctive relief against all defendants. The only remaining claim in this action is the claim for monetary damages under the ADA, which the Court will address in detail below.

4. ELEVENTH AMENDMENT SOVEREIGN IMMUNITY

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has long recognized this language to provide that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State," *Edelman v. Jordan,* 415 U.S. 651, 663 (1974), and that the Eleventh Amendment protects "state agents and state instrumentalities" as well as the States themselves, *Regents of Univ. Of Cal. v. Doe,* 519 U.S. 425, 429 (1997).

As discussed below, the Court must decide two separate issues in addressing the defendants' Eleventh Amendment argument. First, the Court must determine whether defendants effectively waived sovereign immunity in this case to allow suit in federal court. Second, the Court must determine whether the claim for monetary damages against defendants is barred by sovereign immunity.

4.1     Waiver of Immunity[5]

Eleventh Amendment Immunity has attributes of both subject-matter jurisdiction and personal jurisdiction. The text of the amendment itself suggests a limitation on subject-matter jurisdiction: "The Judicial power of the United States shall not be construed to extend..." U.S. Cont. amend. XI; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (stating that the "greater significance [of the Eleventh Amendment] lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III."). Like other issues relating to subject-matter jurisdiction, Eleventh Amendment immunity may be asserted at any time in litigation. *Edelman,* 415 U.S. at 678 (stating that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"

Like a challenge to personal jurisdiction, however, an Eleventh Amendment defense need not be raised by a court *sua sponte;* likewise, a State may choose not to raise the defense. *Atascado State Hosp. v. Scanlon,* 473 U.S. 234 , 238 (1985) (stating that "if a State waives it immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action"). However, a State only waives its sovereign immunity if it invokes federal jurisdiction or if it makes a clear declaration that it intends to submit itself to the federal court jurisdiction. *Bd. of Regents Univ. Wis. Sys. v. Phoenix Int'l*

---

[5] The Court notes that this matter was not fully briefed until approximately one month before trial and well after the deadline for dispositive motions. Indeed, the defendants' assertion of sovereign immunity would have been better addressed at an earlier stage in this litigation. However, the Court is bound to recognize the sovereign immunity defense at any stage in the proceedings. *See Edelman,* 415 U.S. at 678. Accordingly, the Court will deny the plaintiff's Motion to Strike. (Docket #89).

*Software, Inc.,* 653 F.3d 448, 458 (7th Cir. 2011). Courts have found that a State does not waive sovereign immunity by addressing the merits of a lawsuit before seeking dismissal on sovereign immunity grounds. *See Union Pacific R.R. Co. v. La. Pub. Serv. Comm'n.* 662 F.3d 336, 341 (5th Cir. 2011); *Union Elec. Co. v. Mo. Dep't of Conservation.*

Here, the Court finds that the defendants did not waive their Eleventh Amendment immunity defense. Wisconsin is an involuntary defendant who asserted its sovereign immunity defense in its answers to the original complaint and to the amended complaint. (*See* Docket #31 at 10; Docket #12 at 8). The fact that the defendants previously addressed the merits of this case does not waive sovereign immunity, particularly in this case where the merits are relevant to the abrogation of sovereign immunity, as discussed in detail below. Thus, the Court finds that defendants did not waive the sovereign immunity defense. As such, the Court turns to the application of Eleventh Amendment immunity as applied to Title II of the ADA.

4.2     Sovereign Immunity and Title II of the ADA[6]

The plaintiff asserts a claim for damages under Title II of the ADA, which forbids disability discrimination in the provision of public services. 42 U.S.C. § 12132. The Supreme Court has recognized that Title II of the ADA applies to prisoners housed in state prisons. *Pa. Dep't of Corr. V. Yeskey,* 524

---

[6] The Seventh Circuit has yet to address the issue of Eleventh Amendment immunity in the context of Title II. However, as to Title I of the ADA, which addresses discrimination in employment, the Seventh Circuit held that "the ADA does not 'enforce' the Fourteenth Amendment, and…it follows that the Eleventh Amendment and associated principles of sovereign immunity block private litigation against states in federal court." *Erickson v. Bd. of Governors of State Colls. & Univs. for Ne. Illinois Univ.*, 207 F.3d 945, 952 (7th Cir. 2000).

U.S. 206, 213 (1998). The issue is whether the plaintiff's claim for damages here is barred by Eleventh Amendment sovereign immunity.

### 4.2.1  Sovereign Immunity–Legal Standard

Sovereign immunity is not absolute; the Supreme Court has repeatedly held that Congress may abrogate the State's Eleventh Amendment immunity. *See, e.g., Tennessee v. Lane,* 541 U.S. 509, 518 (2004). The ADA specifically provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. This provision clearly and unambiguously expresses congressional intent to abrogate the States' Eleventh Amendment Immunity with respect to claims brought under the ADA. *See Lane,* 541 U.S. at 518; *Bd. of Trs. Of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64 (2001). "The question, then, is whether Congress had the power to give effect to its intent." *Lane,* 542 U.S. at 518.

Although the ADA purports to "invoke the sweep of congressional authority" (42 U.S.C. § 12101(b)(4)), the Supreme Court has held that "the Eleventh Amendment and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976). Thus, Title II of the ADA abrogates the States' Eleventh Amendment immunity only if its enactment represents a valid exercise of authority under § 5 of the Fourteenth Amendment.[7] In *City of Boerne v. Flores,* 521 U.S. 507, 518 (1997),

---

[7] Section 5 of the Fourteenth Amendment authorizes Congress to enact "appropriate legislation" to enforce its substantive guarantees. U.S. Const. amend. XIV § 5.

the Supreme Court found that while Congress may, pursuant to § 5, enact prophylactic legislation prohibiting conduct that is "not itself unconstitutional," it may not substantively redefine Fourteenth Amendment protections. To ensure that Congress merely enforces the Fourteenth Amendment and does not reinterpret it, the Court held that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.

In *United States v. Georgia*, 546 U.S. 151 (2006), the Supreme Court considered a Title II claim in which a state prison inmate sued the state prison system for constitutional violations related to his physical handicap (the plaintiff was confined to a wheelchair). *Id.* at 154–55. The Court in that case held that the abrogation clause of the ADA would be constitutional as applied to the plaintiff's case, provided that the plaintiff had alleged conduct that stated a claim for a violation of Title II of the ADA, and that same conduct also constituted an actual violation of the Fourteenth Amendment. *Id.* at 158–59. The Court explained, however, that the record was not clear as to what conduct the plaintiff intended to allege in support of his Title II claims, so the Court remanded the action with instructions on how to evaluate whether the abrogation clause could constitutionally be applied to his claim. *Id.* at 159. The Court set forth a three-part test to guide lower courts in assessing a sovereign immunity defense to a Title II ADA suit, which required the following:

> determine…on a claim by claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported

>abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.* As such, the Court will apply this test to the claims in the present action.

### 4.2.2   *Georgia* Test Analysis

Under step one of the *Georgia* test, the Court has already found a disputed fact regarding whether the State violated Title II by not granting the plaintiff's request for a single cell and the accommodations he wanted for drug testing. (Docket #79 at 3). Thus, in turning to step two of the analysis, the next question is whether the alleged misconduct violates the Fourteenth Amendment.

#### 4.2.2.1   Step Two–Fourteenth Amendment Violation

The Court previously found in this case that alleged misconduct does not violate the plaintiff's fundamental Eighth Amendment rights incorporated through the Due Process Clause of the Fourteenth Amendment. (Docket #7 at 5-7). The Court also does not find a due process violation in this case. In *Sandin v. Conner*, 515 U.S. 472, 485 (1995), the Supreme Court explained that the Due Process Clause historically encompassed the notion that the State could not physically punish someone except in accordance with due process of law. *Id.* (quoting *Ingram v. Wright*, 430 U.S. 651, 674 (1977)). However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Sandin*, 515 U.S. at 485 (citations omitted). Here, the Court does not find that requiring prisoners to submit urine tests under supervision or the double-celling of prisoners in segregation to be an atypical hardship. *See id; May v. Transcoso,* 412 Fed. Appx. 899, 904 (7th Cir. 2011). Accordingly, the Court does not find that

defendants' conduct independently violates due process under the Fourteenth Amendment.

Finally, the Court finds that the alleged misconduct does not violate the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause forbids a state to "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Within the meaning of the Equal Protection Clause, disabled individuals do not constitute a suspect or protected class. *See City of Cleyborne v. Cleborne Living Ctr., Inc.,* 473 U.S. 432, 466 (1985). Accordingly, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Id.* at 440. Defendants' response to the plaintiff's requests in this case are clearly supported by rational basis. Courts have long held that prison administrators should be afforded deference in the execution and practices that, in their judgment, are needed to preserve the internal order and discipline to maintain institutional security. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 547 (1979). Here, defendants had a legitimate interest in ensuring that drug tests were both reliable and performed efficiently. Likewise, defendants had a legitimate interest in managing its resources to ensure that there is an actual need for a single cell. Thus, defendants' actions in this instance survive rational basis scrutiny and, therefore, do not constitute a violation of the Equal Protection Clause of the Fourteenth Amendment.

####### 4.2.2.2 Step Three–*City of Boerne* Test

Finally, in assessing Title II under the *City of Boerne* test, the Court proceeds in three steps: (1) "to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II," *Lane,* 541 U.S. at 522

(citing *Garrett*, 531 U.S. at 365); (2) to determine "whether Congress enacted Title II in response to a pattern of unconstitutional disability discrimination," Constantine, 411 F.3d at 485 (citing Lane, 541 U.S. at 522–28); and, (3) to determine whether the rights and remedies created by Title II are "congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress." *Lane*, 541 U.S. at 548 (Rehnquist, C.J., dissenting) (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 737–39 (2003); Garrett, 531 U.S. at 372–73). As explained below, the pivotal inquiry here is the third step of the test.

Under the first step of the *City of Boerne* test, this Court must "identify with some precision the scope of the constitutional right[s] at issue." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). In the prison context, Title II clearly implicates the Eighth Amendment and the equal protection rights of the Fourteenth Amendment. Specifically, Title II seeks to curb arbitrary or irrational exclusion of disabled inmates from the services, programs, or benefits provided by the state and to prevent cruel and unusual punishment flowing from the denial of adequate facilities or services to disabled inmates. *See Georgia*, 546 U.S. at 159; *see also Lane,* 541 U.S. at 525 n. 11; *Miller v. King*, 384 F.3d 1248, 1272 (11th Cir. 2004), opinion vacated and superseded by 449 F.3d 1149 (11th Cir. 2006). Additionally, Title II implicates a "constellation of rights applicable in the prison context," *Georgia*, 546 U.S. at 161 (Stevens, J. concurring), including the due process guarantees of the Fourteenth Amendment and the First Amendment rights to the free exercise of religion and free speech.

Under the second step, "we consider whether Title II represents a legislative response to a pattern of unconstitutional disability discrimination

in public 'services, programs, or activities generally.'" *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005). Courts have interpreted *Lane* as conclusively establishing that Title II as a whole survives the historical inquiry under the second step of the *City of Boerne* test. *Id.* (citing *Miller*, 384 F.3d at 1271 n. 25; *Cochran v. Pinchak*, 401 F.3d 184, 191 (3d Cir. 2005), rehearing granted and judgment vacated by 412 F.3d 500 (3d Cir. 2005)). Thus, the second step of the *City of Boerne* test is satisfied.

Under the third step, the Court must determine whether Title II is an appropriately tailored response in light of its object of enforcing the First, Eighth, and Fourteenth Amendment rights identified under step one and the history and pattern of unequal treatment identified under step two. *See Lane*, 541 U.S. at 530–33; *Klingler v. Dir., Dep't of Revenue, Mo.*, 455 F.3d 888, 896 (8th Cir. 2006). In this respect, the Supreme Court has noted "[t]he appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *City of Boerne*, 521 U.S. at 530 (internal citation omitted) (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)).

Here, in the context of state prisons, the Court finds that Title II's prophylactic demand for reasonable accommodation requires far more than does the Constitution. *See Cochran*, 401 F.3d at 193; *Miller*, 384 F.3d at 1275. Title II's demand for modification or accommodation is not tailored to instances when the failure to do so will likely result in an actual constitutional violation. *See City of Boerne*, 521 U.S. at 532 (citing *City of Rome v. United States*, 446 U.S. 156, 177 (1980)). Rather, Title II indiscriminately "prohibits far more state conduct and in many more areas of prison

administration than conceivably necessary to enforce" any relevant constitutional rights. *Miller*, 384 F.3d at 1274. Thus, in the prison context, Title II fails the third step of the *City of Boerne* test because it "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532; *see Brown v. N.C. Div. of Motor Vehicles*, 166 F.3d 698, 707 (4th Cir.1998). Therefore, the Court finds that, in the context of state prisons, Title II validly abrogates state sovereign immunity and "creates a private cause of action for damages against the States" only "for conduct that actually violates the Fourteenth Amendment." *See Georgia*, 546 U.S. at 159. Accordingly, the defendants are entitled to Eleventh Amendment sovereign immunity and plaintiff's claim for monetary damages under Title II will be dismissed.

5. CONCLUSION

As discussed above, the Court finds that: 1) the plaintiff's claim for injunctive relief is moot; and 2) the plaintiff's claim for monetary damages is barred by Eleventh Amendment sovereign immunity. As such, the Court will grant the defendants' Motion for Summary Judgment and dismiss all remaining claims.

Accordingly,

IT IS ORDERED that the defendants' Motion for Summary Judgment (Docket #86) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that defendants' Motion to Stay the Trial (Docket #97) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that Wilke's Motion to Strike (Docket #89) be and the same is hereby DENIED; and

The Clerk of the Court is directed to dismiss this case and enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of December, 2014.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge